**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
*West Palm Beach Division*

| | |
|---|---|
| IN RE:<br><br>**WELLINGTON PRESERVE CORPORATION,**<br><br>Debtor. | CASE NO. 10-22049-EPK<br><br>Chapter 11 |

# EXHIBIT
# NO. 5

PURCHASE AND SALE AGREEMENT

BETWEEN

J-5 WELLINGTON PRESERVE LLC, a Colorado limited liability company

AS PURCHASER,

AND

WELLINGTON PRESERVE CORPORATION, a Florida corporation, as Debtor in
Possession in Case No. 10-22049-EPK, United States Bankruptcy Court, Southern District
of Florida, West Palm Beach Division

AS SELLER

As of April _20_, 2011

{2671918:8}

## TABLE OF CONTENTS

**ARTICLE I PURCHASE AND SALE**

1.1   Agreement of Purchase and Sale

1.2   Permitted Exceptions

1.3   Purchase Price

1.4   Payment of Purchase Price

1.5   Earnest Money

**ARTICLE 2 TITLE AND SURVEY**

2.1   Title Examination; Commitment for Title Insurance

2.2   Survey

2.3   Title Objections; Cure of Title Objections

2.4   Conveyance of Title

2.5   Pre-Closing "Gap" Title Defects

2.6   Lot Exchange

**ARTICLE 3 INPSECTION PERIOD**

3.1   Right of Inspection

3.2   Right of Termination

**ARTICLE 4 CLOSING**

4.1   Time and Place

4.2   Seller's Obligations at Closing

4.3   Purchaser's Obligations at Closing

4.4   Credits and Prorations

4.5   Closing Costs

4.6   Conditions Precedent to Obligation of Purchaser

4.7   Conditions Precedent to Obligation of Seller

**ARTICLE 5 REPRESENTATIONS, WARRANTIES AND COVENANTS**

5.1   Representations and Warranties of Seller

5.2   Knowledge Defined

5.3   Survival of Seller's Representations and Warranties

5.4   Covenants of Seller

{2671918:8}

5.5    Representations and Warranties of Purchaser

5.6    Survival of Purchaser's Representations and Warranties

**ARTICLE 6 DEFAULT**

6.1    Default by Purchaser

6.2    Default by Seller

6.3    Notice of Default; Opportunity to Cure

6.4    Recoverable Damages

**ARTICLE 7 RISK OF LOSS**

7.1    Risk of Loss

7.2    Casualty or Condemnation

7.3    Notice of Condemnation or Casualty

**ARTICLE 8 COMMISSIONS**

8.1    Broker's Commission

8.2    Representation and Indemnity

8.3    Survival

**ARTICLE 9 MISCELLANEOUS**

9.1    Public Disclosure

9.2    Assignment

9.3    Notices

9.4    Modifications

9.5    Calculation of Time Periods

9.6    Successors and Assigns

9.7    Entire Agreement

9.8    Further Assurances

9.9    Counterparts

9.10    Severability

9.11    Applicable Law

9.12    No Third Party Beneficiary

9.13    Exhibits and Schedules

9.14    Captions

{2671918:8}

9.15    Construction

9.16    Termination of Agreement

9.17    Survival

9.18    Time of Essence

{2671916:8}

# PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT (the "Agreement") is made as of April
20, 2011 (the **"Effective Date"**), by and **J-5 WELLINGTON PRESERVE LLC**, a
Colorado limited liability company ("Purchaser"), and **WELLINGTON PRESERVE
CORPORATION**, a Florida corporation, as Debtor in Possession in Case No. 10-22049-EPK,
United States Bankruptcy Court, Southern District of Florida, West Palm Beach Division
("Seller").

## WITNESSETH:

## ARTICLE I

1.    **PURCHASE AND SALE**

1.1.    **Agreement of Purchase and Sale.**  Subject to the terms and conditions
hereinafter set forth, Seller agrees to sell, convey and assign and Purchaser agrees to purchase
the following:

(a)    that certain tract or parcel of land consisting of approximately
420.84 acres, located in Wellington, Palm Beach County, Florida, and more particularly
described on Schedule 1.1(a), attached hereto and made a part hereof (the property described in
this clause (a) being herein referred to as the "**Land**") and being situated in the subdivision more
commonly referred to as "**Wellington Training Club**" (the "Project");

(b)    those rights, easements and appurtenances pertaining to the Land,
including (i) all right, title and interest of Seller (if any) in and to adjacent streets, alleys or
rights-of-way, (ii) strips, gaps and gores, if any, in connection with the Land, (iii) any and all oil,
gas and minerals lying under, in, on or about or constituting a part of the Land, regardless of
whether the minerals are considered part of the surface estate or part of the mineral estate, and
(iv) all right, title and interest of Seller with respect to any easements or covenants that benefit or
burden the Land (the property described in this clause (b) herein referred to collectively as the
"**Related Rights**");

(c)    the structure and other improvements (if any) on the Land,
including, without limitation, any and all infrastructure, roads, streetlights, signage and fencing
(the property described in this clause (c) being herein referred to as the "**Improvements**"); and

(d)    all of Seller's rights as "Declarant" (the "**Declarant's Rights**")
under that certain Declaration of Covenants, Conditions and Restrictions of Wellington Preserve
recorded March 14, 2005 in Official Records Book 18255, Page 807, as amended (the
"**Declaration**");

(e)    all of the Seller's rights and interests in Wellington Training Club
Property Owners' Association, Inc. f/k/a Wellington Preserve Master Homeowners' Association,

{2671918:8}

Inc. (the "**Association**"), and all interest in and to all books, records, bank accounts and other tangible and intangible assets of the Association (the "**Association Property**");

           (f)    all of Seller's right, title and interest in all permits, approvals, plans, specifications, utility agreements, site plans, development orders, and other "developers" or "declarants" rights or agreements benefiting the Land or the Project, including, without limitation, the following: (i) any existing plans, studies, pending and approved permits and permit applications, appraisals, surveys, environmental surveys, site plans, engineering plans, environmental restoration/management plans and permits, drainage plans, reports, soil tests and geotechnical reports, preliminary plat, architectural plans, utility plans, all water use permits and applications, all environmental resource permits issued by the SFWMD, department of transportation permits, property owners' association documents and all other documents relating to the ownership, operation and planned development of the Land, including, without limitation, development orders with the Village of Wellington or Palm Beach County and any development rights under any Master Plan Approvals; (ii) any prepaid governmental impact fees, impact fee credits, prepaid plan review fees, prepaid deposits or similar sums of any nature whatsoever associated with the Project; (iii) any prepaid deposits and credits under vendor contracts; (iv) any concurrency approvals, reservations, water and sewer rights and credits, drainage rights and any other development rights or credits of any nature whatsoever; (v) utility agreements (including, without limitation, all rights under the Utility Services Agreement with the Village of Wellington dated January 8, 2007), including all credits and rights to reimbursement for off-site improvements; and (vi) that certain Escrow Agreement dated as of August 10, 2009 between Seller and the South Florida Water Management District, including, subject to Section 8.1 of this Agreement, all rights to the deposits thereunder (the "**Development Rights**") (the Land, the Related Rights, the Improvements, the Declarant's Rights, the Association Property and the Development Rights are sometimes hereinafter collectively referred to as the "**Property**").

           1.2.   **Permitted Exceptions**.  The Property shall be conveyed, and Purchaser shall accept the Property, subject to the matters which are, or are deemed to be, Permitted Exceptions (as hereinafter defined) pursuant to ARTICLE 2 hereof.

           1.3.   **Purchase Price**.  Seller is to sell and Purchaser is to purchase the Property for a total purchase price of Forty Million and No/100 Dollars ($40,000,000.00) (the "**Purchase Price**"), in the manner set forth herein.

           1.4.   **Payment of Purchase Price**.  The Purchase Price shall be paid as follows:

           (a)    At Closing, the Purchaser shall authorize and direct the Escrow Agent to deliver to Seller (i) the $500,000.00 Earnest Money Deposit (defined below) and (ii) if applicable, the $100,000 Extension Deposit (defined below); and

           (b)    The balance of the Purchase Price (in the amount of Thirty-Nine Million Five Hundred Thousand and No/100 Dollars ($39,500,000.00) or, if the Extension Deposit is made pursuant to the terms hereof, Thirty-Nine Million Four Hundred Thousand and No/100 Dollars ($39,400,000.00)), shall be paid by the Purchaser to the Escrow Agent and plus
{2571918:8}

2

or minus adjustments for the prorations herein (collectively, the **"Closing Payment"**), by wire transfer of immediately available federal funds to a bank account of Fowler White Burnett P.A. in its capacity as escrow agent hereunder (the **"Escrow Agent"**) designated by the Escrow Agent in writing to Purchaser on or prior to the Closing (**"Escrow Agent's Account"**), and shall be subsequently payable in full at Closing in cash by wire transfer of immediately available federal funds to a bank account designated by Seller in writing to the Escrow Agent prior to the Closing.

> 1.5.    **Earnest Money:**

(a)    Within three (3) business days after the Effective Date, Purchaser shall deposit into the Escrow Agent Account the sum of Five Hundred Thousand and No/100 Dollars ($500,000.00) (the **"Earnest Money"**) by wire transfer of immediately available funds.

(b)    The Escrow Agent shall invest the Earnest Money in an interest bearing account with a national banking association having a branch bank within Palm Beach County, Florida pursuant to Purchaser's directions and in accordance with the terms and conditions of Escrow Agent's standard form Escrow Agreement between Purchaser, Seller and Escrow Agent. All interest accruing and other income earned on such sum shall become a part of the Earnest Money and shall be distributed as Earnest Money in accordance with the terms of this Agreement.

**ARTICLE 2**

1062 – 2531999/GML

> 2.    **TITLE AND SURVEY**

2.1.    Title Examination; Commitment for Title Insurance.    Purchaser acknowledges that prior to execution of this Agreement, Seller delivered to Purchaser First American Title Insurance Company (the **"Title Company"**) owners title insurance commitment proposing to insure Purchaser, bearing Issuing Office File No. _____, having an effective date of 4/7/201 at 11:59 p.m. (as initially issued to Purchaser, the **"Title Commitment"**) issued by Fowler White Burnett, P.A. (the **"Title Agent"**), as agent for the Title Company, a copy of which is attached hereto as **Schedule 2.1**, together with copies of all exceptions set forth therein.

2.2.    Survey.    Purchaser acknowledges that prior to the execution of this Agreement, Seller delivered to Purchaser a Boundary Survey of the Real Property prepared by Atlantic Caribbean Mapping, Inc. bearing Job Number 280630, last dated January 12, 2009 (the **"Survey"**).

2.3.    Title Objections; Cure of Title Objections.

(a)    Purchaser shall have until the date that is thirty (30) days after the Effective Date (the **"Title Objection Date"**) to notify Seller, in writing, of such objections as Purchaser may have to the Title Commitment or to the documents set forth in Section 2.3(a) (1) or (2), below, other than the Permitted Exceptions described in Section 2.4(b) through (e) below.

{2671918:8}

3

(1)     Purchaser acknowledges that Seller has executed and delivered to the Village that certain Grant of Easement for Equestrian Trails dated July 6, 2005 (the "**Bridle Trail Easement**"), a copy of which is attached hereto as **Schedule 2.3(a)(1)**, but which has not yet been recorded in the Public Records of Palm Beach County, Florida. Purchaser acknowledges that if the Village records the Bridle Trail Easement, same will appear as a Schedule B-II, Exception to an updated or an endorsement to the Title Commitment and therefore, Purchaser, having been previously provided a copy of the Bridle Trail Easement, shall notify Seller, in writing, of any objections to the Bridle Trail Easement Purchaser may have on or before the Title Objection Date.

(2)     Any item contained in the (a) Title Commitment, (b) Bridle Trail Easement, (c) Title Modifications (as hereinafter defined) and (d) any matter shown on the Survey to which Purchaser does not object on or before the Title Objection Date shall also be deemed a "**Permitted Exception**". Notwithstanding the foregoing, Purchaser reserves the right to review and object to (i) Schedule B-II, Item 10 of the Title Commitment, to confirm that the Property is included within the scope of the Release of Surface Exploration Rights, (ii) Schedule B-II, Item 16, to review the impact of the Utility Services Agreement on the Property, and (iii) Schedule B-II, Item 21 of the Title Commitment, which will be deleted from the Title Policy if it does not affect the Property.

(b)     In the event Purchaser shall notify Seller of objections to title or to matters shown on the Survey on or before the Title Objection Date, Seller shall have the right, but not the obligation, to cure such objections. On or before the tenth (10th) business day from and after Seller's receipt of Purchaser's notice of objections, Seller shall notify Purchaser in writing whether Seller elects to attempt to cure such objections (and Seller's failure to provide such a notice shall be deemed an election by Seller not to cure any such objection). If Seller elects to attempt to cure, and provided that Purchaser shall not have terminated this Agreement in accordance with Section 3.2 hereof, then Seller shall use commercially reasonable efforts to cure such objection or objections within ninety (90) days of the Effective Date. If Seller elects (or is deemed to have elected) not to cure any objections specified in Purchaser's notice or, after using commercially reasonable efforts, is unable to cure such objection or objections within ninety (90) days of the Effective Date, then in either such case Purchaser shall have the right to elect one, but not both, of the following options, which election must in each case be made within the time period provided in paragraph (c) below:

(1)     To accept a conveyance of the Property subject to the Permitted Exceptions, specifically including any matter objected to by Purchaser which Seller is unwilling or unable to cure, and without reduction of the Purchase Price; or

(2)     To terminate this Agreement by sending written notice thereof to Seller and, upon delivery of such notice of termination, this Agreement shall terminate and the Earnest Money (plus any accrued interest) shall be returned to Purchaser in accordance with Section 1.6 of this Agreement, and thereafter neither party hereto shall have any further

{2671918:8}

4

rights, obligations or liabilities hereunder except to the extent that any right, obligation or liability set forth herein expressly survives termination of this Agreement.

(c)     If Seller notifies Purchaser that Seller does not intend to attempt to cure any title objection, or if Seller is deemed to have elected not to cure any title objection, then in any such case Purchaser shall, within ten (10) business days after receiving Seller's notice or the date of Seller's deemed election, as applicable, notify Seller in writing whether Purchaser shall elect to accept the conveyance under clause (b)(1) above or to terminate this Agreement under clause (b)(2) above (with Purchaser's failure to provide such a notice deemed an election by Purchaser to terminate this Agreement under clause (b)(2) above).

2.4.     <u>Conveyance of Title</u>.  At Closing, Seller shall convey and transfer the Property to Purchaser, subject only to the following matters:

(a)     Permitted Exceptions;

(b)     the lien of all ad valorem real estate taxes and assessments not yet due and payable as of the date of Closing, subject to proration and adjustment as herein provided;

(c)     local, state and federal laws, ordinances or governmental regulations, including but not limited to, building, zoning and land use laws, ordinances and regulations, now or hereafter in effect relating to the Property;

(d)     additional items, if any, appearing of record or shown on the Survey, approved or deemed approved by Purchaser pursuant to Section 2.3 or 2.5 hereof; and

(e)     additional items, if any, approved by Purchaser pursuant to Section 5.4 hereof.

2.5.     <u>Pre-Closing "Gap" Title Defects</u>.  Subject to Section 2.3 above, whether or not Purchaser shall have furnished to Seller any notice of title objections pursuant to the foregoing provisions of this Agreement, Purchaser may, at or prior to Closing, notify Seller in writing of any objections to title first raised by the Title Company or the Surveyor after the effective date of the Title Commitment or Survey, as appropriate; provided, however, that Purchaser must notify Seller of any such objections within five (5) business days of Purchaser's first receipt of the updated Title Commitment or updated Survey, whichever first provides notice of the condition giving rise to any such objection. Any objection to title or matters of Survey made by Purchaser to Seller pursuant to this Section 2.5 shall only be made if such title objection or matter of Survey materially and adversely affects Purchaser's ability to develop the Property or imposes any material burden on the Land.   With respect to any objections to title or Survey set forth in such notice, Seller shall have the same option to cure and Purchaser shall have the same option to accept title subject to such matters or to terminate this Agreement as those which apply to any notice of objections made by Purchaser on or before the Title Objection Date.

{2671918:8}

## ARTICLE 3

3.    **INSPECTION PERIOD**

### 3.1.    <u>Right of Inspection</u>.

(a)    Commencing with the Effective Date and continuing thereafter so long as this Agreement remains in full force and effect, Purchaser shall have the right to make a physical inspection of the Property, and Purchaser, personally or through agents, employees or contractors, may go upon the Property during normal business hours or at other reasonable times to make boundary line or topographical surveys and to conduct such studies, tests, samplings, investigations and analyses of any and all aspects of the Property as Purchaser deems desirable, including, without limitation, engineering, environmental, soil, groundwater and other tests, samplings and studies of the Property; provided, however, Purchaser shall give Seller at least one (1) business day's advance notice of any physical inspection of the Property. In addition, Seller shall provide Purchaser and its Consultants access to all books and records of the Association, including, without limitation, all financial records of the Association.

(b)    In addition to any other reasonable obligation to assist Purchaser in the inspection of the Property, Seller hereby agrees to instruct Seller's current vendors, consultants and agents ("**Seller's Consultants**") to deliver to Purchaser, at Purchaser's sole cost and expense, upon Purchaser's reasonable request, complete copies of all materials in Seller's Consultants actual possession described on **Schedule 3.1(b)** attached hereto (collectively, the "**Property Documents**"). Further, Seller shall instruct Seller's Consultants to cooperate with Purchaser's inquiries related to the Property. In connection therewith, and as a part of the Property Documents, Seller shall instruct O'Dell, Inc. ("**O'Dell**") to provide to Purchaser copies of all correspondence with the South Florida Water Management District (the "**SFWMD**"), all reports filed with the SFWMD and all communications with environmental consultants regarding the water use permits, the Permit Non-Compliance (as hereinafter defined), and any other matter relating to the environmental condition of the Property.

(c)    Purchaser shall use the Property Documents solely for the purpose of evaluating the Property, which shall be kept strictly confidential by Purchaser; provided, however, that (i) any of such Property Documents may be disclosed to Purchaser's directors, officers, partners, members, employees, consultants, attorneys, representatives, prospective investors, lenders and buyers and their respective representatives (the "**Purchaser's Consultants**") who need to know such information for the purpose of evaluating the Property, and (ii) any disclosure of such information may be made to which Seller consents in advance in writing in the Seller's sole discretion. Purchaser shall inform Purchaser's Consultants who receive the Property Documents of the confidential nature of such information, will direct in writing any such person to treat such information confidentially and will use commercially reasonable efforts to obtain written confidentiality agreements from Purchaser's Consultants. Notwithstanding the foregoing, the obligation to keep the Property Documents confidential does not extend to any documents or information that (a) is or becomes generally available to the public without

{2671918:8}                                           6

violation of any obligation of confidentiality by Purchaser or Purchaser's Consultants, (b) becomes available to Purchaser or Purchaser's Consultants on a non-confidential basis from a source that is not prohibited from disclosing such information by legal, contractual, or fiduciary obligations, or (c) is independently developed by Purchaser or Purchaser's Consultants without use, directly or indirectly, of the confidential Property Documents received from Seller. Further, Purchaser shall not, and shall direct Purchaser's Consultants not to, discuss this Agreement with any Village of Wellington, Florida ("Village"), South Florida Water Management District ("SFWMD") or Palm Beach County ("County") government official, agency, representative or employee without first providing Seller and O'Dell, Inc., 3500 Fairlane Farms Road, Suite No. 4, Wellington, Florida 33414, Attention: Michael O'Dell, President, with not less than three (3) business day's advance notice of Purchaser's intent to have such discussions. At Purchaser's request or Seller's election, Seller, at Seller's sole cost and expense, shall arrange for O'Dell, Seller's attorney and/or other consultant(s) to attend meetings with Purchaser and the Village, the SFWMD and/or the County. In the event Purchaser or anyone to whom Purchaser provides any Property Documents in accordance with this Agreement is requested or required, in connection with any legal proceeding, to disclose any Property Documents treated as confidential under this Agreement, Purchaser shall give Seller prompt written notice of such request or requirement so that Seller may seek an appropriate protective order or other remedy and/or waive compliance with the provisions of this Agreement, and Purchaser, at Purchaser's sole cost and expense will cooperate with Seller to obtain such protective order or remedy. In the event that such protective order or other remedy is not obtained or Seller waives compliance with the relevant provisions of this Agreement, Purchaser (or such other persons to whom such request or requirement is directed) will furnish only that portion of the Property Documents which, in the opinion of Purchaser's legal counsel, is legally required to be disclosed. In the event that this Agreement is terminated for any reason, by either party, Purchaser and Purchaser's Consultants shall promptly redeliver to Seller all copies of Property Documents, in written, electronic or other form and any other material containing or reflecting any information in the Property Documents and will not retain any copies, extracts or other reproductions in whole or in part of such written material. All documents, memoranda, notes and other writings whatsoever prepared by Purchaser or Purchaser's Consultants based on the information in the Property Documents shall also be destroyed.

(d)    Purchaser acknowledges that Seller has entered into a contract for a portion of the Wellington Training Club as described on Exhibit 3.1(d) attached hereto (the "**Adjacent Property**"). In connection therewith, Seller has agreed to negotiate in good faith the terms and conditions upon which the Adjacent Property shall (i) be released from the Declaration of Restrictive Covenants, Conditions and Restrictions of Wellington Preserve in a form (the "**Fourth Amendment to Declaration**") substantially similar to that entitled "Third Amendment to Declaration of Covenants, Conditions and Restrictions of Wellington Preserve and Impositions of Alternative Covenants and Conditions and Restrictions" recorded in Official Records Book 23862, Page 0567, Public Records of Palm Beach County, Florida, (ii) be subject to a reciprocal easement and maintenance agreement (the "**Easement/Maintenance Agreement**") substantially similar to the "Reciprocal Easement and Maintenance Agreement" recorded in Official Records Book 23682, Page 0573, Public Records of Palm Beach County,

{2671918:8}

7

Florida, except that the purchaser of the Adjacent Property's proportionate share of Surface Water Expenditures shall be twenty (20%) percent (subject to confirmation of the proportionate share based on acreage pursuant to the Survey), (iii) be subject to a reciprocal easement agreement to (x) provide access to the Land from 50th Street, and (y) provide the Association access to the adjoining property controlled by the Association (the "REA"), (iv) be released from the Stormwater Quality Protection Easement (the "**Stormwater Easement**") in a form substantially similar to that entitled "Termination of Easement and Amended and Restated Storm Water Quality Protection Easement" recorded in Official Records Book 23432, Page 1455, Public Records of Palm Beach County, Florida. In addition, Purchaser acknowledges that Seller has agreed to execute and record a memorandum in the Public Records which memorializes the owner of the Adjacent Property's rights to modify the existing permits and approvals for the Wellington Training Club (and its predecessors) relating to the Adjacent Land (the "**Memorandum**"). Subject to Purchaser's review and approval of the Fourth Amendment to Declaration, Easement/Maintenance Agreement, REA, Stormwater Easement and Memorandum (collectively, the "**Title Modifications**"), which approval shall not be unreasonably withheld, conditioned or delayed, such Title Modifications shall become Permitted Exceptions.

        (e)     Purchaser shall maintain general commercial liability insurance with limits of at least $1,000,000, to cover the activities of all persons and entities entering the Property at Purchaser's request, and such insurance policy shall name Seller as an additional insured, evidence of same being provided to Seller prior to Purchaser and Purchaser's Consultants initial entry onto the Property.

        (f)     Purchaser shall indemnify, hold harmless and defend Seller from and against any and all claims, demands, causes of action, liabilities, losses, costs, damages and expenses (including reasonable attorneys' fees and expenses and court costs incurred in defending any such claim or in enforcing this indemnity) of whatsoever nature (individually a "**Claim**" and collectively, "**Claims**") that may be incurred by Seller and arising out of or in connection with the acts or omissions of Purchaser and its agents, representatives, contractors and consultants, or any of them, including but not limited to Claims arising out of or in connection with personal injury or death of persons, loss, destruction or damage to property, or liens or claims of lien filed against the Property, excluding, however, any Claims to the extent such Claims arise out of the discovery of, but not the actual or threatened release or movement of, any Hazardous Materials resulting from Purchaser's inspections and other activities (unless the Hazardous Materials are brought onto the Property by Purchaser or Purchaser's authorized agents, employees, consultants or contractors). This Section 3.1(f) shall survive Closing or any termination of this Agreement.

        (g)     During the Inspection Period (as hereinafter defined), Seller shall reasonably cooperate with Purchaser and execute such consents, applications and other instruments as may be reasonably necessary to commence any desired replat of any portion of the Land (the "**Replat**") and obtain any other permits, approvals or transfers of the same necessary in connection with the Purchaser's intended use of the Property, it being acknowledged that Purchaser intends to develop approximately 200 acres of the Land as a

{2671918:8}

8

private equestrian and polo facility. In no event shall Purchaser obtain final approval from all governmental authorities of the Replat prior to Closing. In the event that the Closing does not occur, Purchaser shall terminate any and all applications, permits and approvals executed pursuant hereto.

3.2.    **Right of Termination.**

(a)    Seller agrees that in the event Purchaser determines in Purchaser's sole discretion, that it does not wish to acquire the Property for any reason or no reason, then Purchaser shall have the right to terminate this Agreement by giving written notice of such termination to Seller on or before the date that is thirty (30) days after the Effective Date (the "**Inspection Date**"). Upon any such termination of this Agreement pursuant to Purchaser's rights under this Section 3.2, the Earnest Money shall be returned to Purchaser in accordance with Section 1.6 hereof, all Property Documents shall be returned to Seller pursuant to Section 3.1(c) and Purchaser and Seller shall have no further rights and obligations hereunder except those which expressly survive termination of this Agreement. The period commencing on the Effective Date and ending on the Inspection Date is sometimes referred to herein as the "**Inspection Period**".

(b)    Purchaser shall have the right to extend the Inspection Period for a period of fifteen (15) days (the "**Extension Period**") immediately following the expiration of the Inspection Period by, no later than the expiration of the Inspection Period: (i) giving Seller written notice of its intention to extend the Inspection Period; and (ii) depositing with the Escrow Agent an additional earnest money deposit in the amount of $100,000.00 (the "**Extension Deposit**"), which Extension Deposit shall be deemed a part of the Earnest Money Deposit. If the Inspection Period has been extended as contemplated by this subsection (b) and this transaction closes, the Extension Deposit (together with all accrued interest) shall be credited toward the Purchase Price at Closing.

4.    **CLOSING**

4.1.    **Time and Place.**

(a)    The consummation of the transaction contemplated hereby ("**Closing**") shall be held at the office of the Title Agent within ten (10) business days after the later to occur of (i) the date Seller receives the approvals set forth in Section 4.7(a) and (b), and (ii) the Inspection Date, subject to any extension as provided in Section 5.4(b). At Closing, Seller and Purchaser shall perform the obligations set forth in, respectively, Section 4.2 and Section 4.3. The Closing may be held at such other place or such earlier time and date as Seller and Purchaser shall mutually approve in writing. The date on which the Closing is scheduled to occur hereunder (or, if earlier, the date on which Closing occurs) is sometimes referred to herein as the "**Closing Date**". If Seller does not obtain the approvals set forth in Sections 4.7(a) and (b) within ninety (90) days of the Effective Date, the Purchaser will have the right to terminate this Agreement and receive a full refund of the Earnest Money deposit.

{26719188}

9

4.2.   <u>**Seller's Obligations at Closing**</u>.   At Closing, Seller shall:

(a)   Deliver to Purchaser a special warranty deed in the form attached hereto as **Exhibit 4.2(a)** and by this reference made a part hereof, duly executed by Seller, pursuant to which Seller shall convey the Real Property to Purchaser subject only to the Permitted Exceptions (the "**Deed**").

(b)   Deliver to the Title Company such evidence as the Title Company may reasonably require as to the authority of the person or persons executing documents on behalf of Seller.

(c)   Deliver to Purchaser an affidavit duly executed by Seller stating that is not a "foreign person" as defined in the Federal Foreign Investment in Real Property Tax Act of 1980 and the 1984 Tax Reform Act.

(d)   Deliver to the Title Company and Purchaser a title insurance affidavit, duly executed by Seller, in form and content reasonably satisfactory to the Title Company which shall be sufficient for the Title Company to issue the Title Policy (as hereafter defined) and to delete all standard pre-printed exceptions contained in the Title Policy, including the "gap" exception.

(e)   Deliver to Purchaser possession and occupancy of the Property, subject only to the Permitted Exceptions.

(f)   Deliver to the Title Company and Purchaser, in recordable form, (i) a certified copy of the appropriate Order from the U.S. Bankruptcy Court for the Southern District of Florida (10-22049-EPK) authorizing the sale of the Property to Purchaser (the "**Sale Order**") and (ii) approval of the Supreme Court of Commonwealth of the Bahamas authorizing the sale of the Property to Purchaser.

(g)   Deliver to Purchaser an appropriate assignment(s) of all books, records, bank accounts and other matters relating to the operation of the Association. In connection therewith, Seller shall turnover control of the Association to Purchaser and all officers of the Association shall appropriately resign and relinquish any control over the Association.

(h)   Deliver to Purchaser an appropriate assignment(s) of the Declarant's Rights and the Development Rights. Further, Seller shall without further consideration reasonably cooperate with Purchaser and execute and deliver such other consents and documents and take such other action, whether prior or subsequent to Closing, as may be reasonably requested by Purchaser with respect to the Development Rights, including, without limitation, delivering a power of attorney in favor of F. Martin Perry to permit Purchaser to take all actions related to the Development Rights as deemed reasonably necessary by Purchaser in connection with the Land prior to the Closing.

{2671918:8}

10

4.3.    **Purchaser's Obligations at Closing.**  At Closing, Purchaser shall:

(a)    Deliver to the Escrow Agent the full amount of the Closing Payment in immediately available federal funds wire transferred to the Escrow Agent's Account pursuant to Section 1.5 above, it being agreed that at Closing the Earnest Money shall be applied towards payment of the Closing Payment, and deliver to the Escrow Agent instructions to release the full amount of the Closing Payment, as increased or decreased by prorations and adjustments as herein provided to Seller upon Seller's compliance with Section 4.2 above.

(b)    Deliver to Seller such evidence as the Title Company may reasonably require as to the authority of the person or persons executing documents on behalf of Purchaser.

(c)    Deliver such additional documents as shall be reasonably requested by the Title Company or Seller or required to consummate the transaction contemplated by this Agreement, provided, however, that in no event shall Purchaser be required to undertake any other liability not expressly contemplated in this Agreement, unless Purchaser elects to do so in its sole discretion.

4.4.    **Credits and Prorations.**

(a)    All income and expenses in connection with the operation of the Property shall be apportioned, as of 12:01 A.M., on the Closing Date, as if Purchaser were vested with title to the Property during the entire Closing Date, such that, except as otherwise expressly provided to the contrary in this Agreement, Seller shall have the benefit of income and the burden of expenses for the day preceding the Closing Date and the Purchaser shall have the benefit of income and the burden of expenses for the Closing Date and thereafter, all of which will be prorated at Closing utilizing the information known at that time and a post-closing "true-up" shall take place within ninety (90) days of the Closing Date to adjust said prorations, if necessary; provided, however, that if the real estate tax bill for the year of the Closing is not available within said ninety (90) day period, the re-proration of the real estate taxes and assessments shall accrue within sixty (60) days of issuance of the tax bill.  Such prorated items shall include, without limitation, the following:

(1)    ad valorem taxes and assessments levied against the Property for the tax year in which Closing occurs with credit given for maximum discount, unless taxes have been paid or will be paid at Closing for the applicable tax year, in which event the actual taxes and assessments paid, less any penalties and/or interest payable if the taxes and assessments are delinquent, will be prorated; and

(2)    any utility costs and other operating expenses or other items pertaining to the Property which are customarily prorated between a purchaser and a seller in the area in which the Property is located, including, without limitation, any assessments against the Property or any portion thereof under any private covenants or declarations encumbering the Property.

{2671918:8}

11

(b)     If taxes and assessments for the current year have not been paid before Closing, Seller shall be charged at Closing an amount equal to that portion of such taxes and assessments which relates to the period before Closing. Any such apportionment made with respect to a tax year for which the tax rate or assessed valuation, or both, have not yet been fixed shall be based upon the tax rate and/or assessed valuation last fixed and will be prorated giving due allowance for the maximum discount allowable by law.

(c)     On or prior to closing, Seller shall fund any and all budget and operating deficits of the Association.

(d)     The provisions of this Section 4.4 shall survive Closing.

4.5.    **Closing Costs**.

(a)     Seller shall pay (i) the fees of any counsel representing it in connection with this transaction, (ii) all transfer taxes, documentary tax stamps and similar charges relating to the transfer of the Property, (iii) the premium for the Title Policy and any costs associated with any title searches relating to the Property, (iv) the costs of curing all title objections for which Seller is responsible under this Agreement, (v) any escrow fee charged by the Escrow Agreement, and (vi) all other costs for which Seller is responsible under this Agreement.

(b)     Purchaser shall pay (i) the fees of any counsel representing Purchaser in connection with this transaction, (ii) the cost of the Survey, (iii) the administrative recording charges for the Deed, (iv) the cost of Purchaser's inspections of the Property, and (v) the premiums for each endorsement to the Title Policy requested by Purchaser.

(c)     Except as otherwise provided herein, all other costs and expenses incident to this transaction and the Closing shall be paid by the party incurring same.

4.6.    **Conditions Precedent to Obligation of Purchaser**.  The obligation of Purchaser to consummate the transaction hereunder shall be subject to the fulfillment on or before the Closing Date (or such earlier time as otherwise required hereby) of all of the following conditions, any or all of which may be waived by Purchaser in its sole discretion:

(a)     Seller shall have delivered to Purchaser all of the items required to be delivered to Purchaser by Seller or Seller's agents pursuant to the terms of this Agreement, including but not limited to, those provided for in Section 4.2 of this Agreement.

(b)     All of the representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects as of the Closing Date, as if made and updated as of the Closing Date.

{2671918:8}

12

(c)     Seller shall have performed and observed, in all material respects, all covenants and agreements of this Agreement to be performed and observed by Seller as of the Closing Date.

(d)     The Title Company shall have issued the Title Policy to Purchaser (or unconditionally committed to issue the Title Policy to Purchaser). "**Title Policy**" means an extended coverage American Land Title Association (ALTA) Owner's Policy (Form 2006 with Florida modifications) of Title Insurance insuring Purchaser's fee simple title to the Real Property, in the full amount of the Purchase Price subject only to the standard exceptions (except as otherwise required in Section 4.2) and the Permitted Exceptions, together with the following endorsements (the premiums for which to be paid by Purchaser) (i) Owner's Florida Form 9, (ii) Owner's ALTA PUD, (iii) contiguity, and (iv) Survey.

(e)     Although the Seller has not received any notification of Permit Non-Compliance (as herein defined), the Seller has not provided water samplings as required by the South Florida Water Management District (SFWMD) Environmental Permit No. 50-00548-S-96 ("**Permit Non-Compliance**"). Other than the Permit Non-Compliance, which Purchaser hereby waives any obligation of Seller to cure , Seller shall not have received written notice from any governmental authority asserting any violation of Environmental Laws related to the Property which has not been cured or corrected as of the Closing Date. The term "**Environmental Laws**" includes without limitation the Resource Conservation and Recovery Act and the Comprehensive Environmental Response, Compensation, and Liability Act and other federal laws governing the environment as in effect on the date of this Agreement together with their implementing regulations as of the date of this Agreement applicable to the Property, and all applicable state, regional, county, municipal and other local laws, regulations and ordinances that are equivalent or similar to the federal laws recited above or that purport to regulate hazardous or toxic substances and materials.

(f)     The Sale Order states and confirms, to Purchaser's reasonable satisfaction, that all of the Property, including, without limitation, the Development Rights, shall be transferred and assigned to Purchaser free and clear of all liens, encumbrances and claims of other creditors.

(g)     All other conditions precedent to Purchaser's obligation to consummate the transaction hereunder (if any) which are set forth in this Agreement shall have been satisfied on or before the Closing Date.

4.7.    **Conditions Precedent to Obligation of the Seller**.  The obligation of Seller to consummate the transaction hereunder shall be subject to the fulfillment on or before the date of Closing of all of the following conditions, any or all of which may be waived by Seller in its sole discretion:

(a)     Seller shall have obtained approval of this Agreement and the transaction contemplated hereby from the United States Bankruptcy Court Southern District of Florida.

(2671918:8)

13

(b)     Seller shall have obtained approval of this Agreement and the transaction contemplated hereby from the Supreme Court Commonwealth of the Bahamas.

(c)     Seller shall have received the Purchase Price as adjusted pursuant to and payable in the manner provided for in this Agreement.

(d)     Purchaser shall have delivered to Seller and/or the Title Company all of the items required to be delivered by Purchaser or Purchaser's agents pursuant to the terms of this Agreement, including but not limited to, those provided for in Section 4.3 of this Agreement.

(e)     All of the representations and warranties of Purchaser contained in this Agreement shall be true and correct in all material respects as of the Closing Date as if made and updated as of the Closing Date.

(f)     Purchaser shall have performed and observed, in all material respects, all covenants and agreements of this Agreement to be performed and observed by Purchaser as of the Closing Date.

(g)     All other conditions precedent to Seller's obligation to consummate the transaction hereunder (if any) which are set forth in this Agreement shall have been satisfied in all material respects on or before the Closing Date.

## ARTICLE 5

5.      **REPRESENTATIONS, WARRANTIES AND COVENANTS**

5.1.    <u>Representations and Warranties of Seller</u>.  Seller hereby makes as of the Effective Date the following representations and warranties to Purchaser, which representations and warranties shall be updated as of the Closing Date pursuant to Seller's Closing Certificate:

(a)     **Organization and Authority**.  Based solely upon the Certificate of Good Standing dated _____, 2011 issued by the Secretary of State for the State of Florida, Seller is validly existing and in good standing as a corporation under the laws of the State of Florida. Subject to approval from the Supreme Court of the Commonwealth of the Bahamas ("**Bahamian Court**") and the United States Bankruptcy Court Southern District of Florida, West Palm Beach Division ("**U.S. Bankruptcy Court**" and together with the Bahamian Court collectively, the "**Court Approvals**"), (i) Seller has the full right and authority to enter into this Agreement and to sell and transfer the Property pursuant hereto and to consummate or cause to be consummated the transactions contemplated herein, (ii) the person signing this Agreement on behalf of Seller is authorized to do so, (iii) neither the execution and delivery of this Agreement nor any other documents executed and delivered, or to be executed and delivered, by Seller in connection with the transactions described herein, will, to the best of Seller's actual knowledge, violate any provision of Seller's organizational documents or, any

{2671918:8}

14

material agreements, regulations, or laws to or by which Seller is bound, and (iv) subject to the Court Approvals, this Agreement has been duly authorized, executed and delivered by Seller, and, assuming the due execution and delivery of this Agreement by Purchaser, is the valid and binding obligation of Seller and is enforceable against Seller in accordance with its terms subject to applicable bankruptcy, insolvency, reorganization, moratorium, and other laws affecting the rights of creditors generally and the exercise of judicial discretion in accordance with general principles of equity.

(b)     **Consents**.  Subject to the Court Approvals, Seller has obtained all consents and permissions (if any) related to the transactions herein contemplated and required under Seller's organizational documents or any covenant, agreement, encumbrance, law or regulation by which Seller or the Property is bound.

(c)     **Pending Actions**.  Unless otherwise disclosed herein or in the Title Commitment, to Seller's actual knowledge, no action, suit, arbitration, administrative or judicial proceeding, or unsatisfied order or judgment is pending or threatened against Seller which pertains directly to the Property or the transaction contemplated by this Agreement. In addition, unless otherwise disclosed herein, to Seller's actual knowledge, there exists no other action, suit, arbitration, administrative or judicial proceeding, or unsatisfied order or judgment which is pending or threatened against Seller which, if adversely determined, would have a Material Adverse Effect. As used in this Agreement, "**Material Adverse Effect**" means, with respect to any fact or circumstance, that such fact or circumstance would individually or in the aggregate, have a material adverse effect on title to the Property or any portion thereof, or Seller's ability to consummate the transaction contemplated herein, or on the physical condition, legal estates or ability to develop the Property pursuant to the Master Plan.

(d)     **Condemnation**.  Seller has no actual knowledge of any pending, threatened or contemplated action by any governmental authority or agency having the power of eminent domain, which might result in any part of the Property being taken by condemnation or conveyed in lieu thereof. Seller shall, promptly upon receiving any such notice or learning of any such contemplated or threatened action, give Purchaser written notice thereof.

(e)     **Existing Agreements: Service Contracts**.  Unless otherwise disclosed herein, there are no leases, purchase contracts, options, service contracts, maintenance contracts, management agreements or other agreements or understandings relating to the operation and/or management of the Property to which Seller is a party or by which Seller is bound, that will be binding on Purchaser or the Property on or after the Closing Date, except for the Permitted Exceptions.

(f)     **Conflicts**.  To Seller's actual knowledge, there is no agreement to which Seller is a party, or binding on Seller, which is in conflict with this Agreement.

(g)     **Contractors and Suppliers**.  To Seller's actual knowledge, all contractors, subcontractors, suppliers, architects, engineers, and others who have performed services or labor for or supplied material to Seller with respect to the Property have been or will
{2671918:8}

15

be paid in full on or before the Closing Date, and all liens arising from any such services, labor or materials (or claims with which the passage of time or notice or both could mature into liens) have been satisfied and released or will, subject to Court Approval, be satisfied and released on or before the Closing Date.

          (h)    **Permits and Legal Compliance**.  To Seller's actual knowledge, Seller has not received written notice of an intention of any governmental authority to revoke any license, permit or certificate required for the development, use, operation or occupancy of the Property nor, to the best of Seller's knowledge, has Seller received any written notice that the Property is in violation of any zoning, building, fire, health, environmental (other than the Permit Non-Compliance) or other law, statute, ordinance, regulation or order of any governmental or public authority applicable to the Property or any private covenants or restrictions encumbering the Property that remains uncured.

          (i)    **Association**.  Seller, as "Declarant" under the Declaration, retains control of the Association and has the authority to make such assignments, transfers and deliveries with respect to the Association as required by the terms of this Agreement.

          (j)    **Developer Obligations**.  Except as disclosed on Schedule 5.1(j), to Seller's actual knowledge, Seller has performed any and all obligations and paid any and all required fees, charges, deposits and other amounts, required of Seller with respect to the development Property pursuant to any applicable law, statute, ordinance, regulation, contract, resolution or other demand of any governmental or public authority.   To Seller's actual knowledge, Seller has not received written notice from any governmental or public authority of any default under any such applicable law, statute, ordinance, regulation, contract, or resolution.

      5.2.    **Knowledge Defined**.   Reference to "Seller's actual knowledge" and any other similar phrase relating to the Seller's knowledge herein shall refer only to the actual knowledge of the Seller. CLICO (Bahamas) Limited, a Bahamian corporation ("CLICO"), was ordered liquidated by the Supreme Court of the Commonwealth of the Bahamas on or about April 17, 2009 at which time Craig A. (Tony) Gomez was appointed the Liquidator of CLICO. CLICO Enterprises Ltd., a Bahamian corporation ("Enterprises"), an affiliate of CLICO was ordered liquidated by the Supreme Court of the Commonwealth of the Bahamas on or about September 10, 2009 at which time Craig A. (Tony) Gomez was appointed its Liquidator. Seller is a wholly owned subsidiary of Enterprises and Craig A. (Tony) Gomez was elected the President thereof on or about April 17, 2009 and is the only officer and employee of the Seller. Since his election as President of Seller, Craig A. (Tony) Gomez has not been involved in the day to day management and operation of the Company and, as such, has very limited knowledge of the Seller and his knowledge of the Seller is based upon information provided to him by Seller's consultants. Reference to "knowledge" of the Seller shall refer only to the actual knowledge of Craig A. (Tony) Gomez, after inquiry to Seller's consultants, and "knowledge" of any prior officer, director, shareholder, or employee of the Seller shall not, in any manner, be construed or interpreted to mean "knowledge" of the Seller.

{2671918:8}

16

     5.3.    **Survival of Seller's Representations and Warranties**.    The representations and warranties of Seller set forth in Section 5.1 shall not merge into the Deed and shall survive Closing for a period of six (6) months.

     5.4.    **Covenants of Seller**.    Seller hereby covenants with Purchaser, from the Effective Date until the Closing or earlier termination of this Agreement, as follows:

     (a)    **Maintenance of Property**.    Seller shall, at its sole cost and expense, (i) maintain the Property in a manner generally consistent with the manner in which Seller has maintained the Property prior to the date hereof and (ii) fund the Property's share of any and all property owner's association assessment and expenses.

     (b)    **Provide Copies of Notices**.    Seller shall furnish Purchaser with a copy of all written notices received by Seller from any governmental authority with regard to the violation of any law, statute, ordinance, regulation or order of any governmental or public authority relating to the Property within the earlier of (i) five (5) business days following Seller's receipt thereof or (ii) Closing. If such notice is received by Purchaser within five (5) business days prior to the expiration of the Inspection Period, then the Inspection Period shall be automatically extended through and including the date that is five (5) business days following Purchaser's receipt thereof. If such notice is received by Purchaser within five (5) business days prior to the Closing, then, at Purchaser's election, Closing shall be automatically extended to the date that is five (5) business days following Purchaser's receipt thereof.

     (c)    **Execution of New Contracts**.    Unless otherwise provided for herein, Seller shall not enter into, modify or amend any contract or agreement that will be an obligation affecting the Property or binding on Purchaser after the Closing without Purchaser's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed so long as it is not materially adverse to Purchaser or impose any obligations on Purchaser. In the event Seller requests Purchaser's prior consent to any contract or agreement that will be an obligation affecting the Property or binding on Purchaser after the Closing, Purchaser shall, after receipt of such request, have five (5) business days to provide Seller with such written consent. Failure of Purchaser to provide written approval within such five (5) business days shall be deemed Purchaser's written objection to same.

     (d)    **Maintenance of Permits**.    Other than Permit Non-Compliance, Seller, shall, at its sole cost and expense, maintain all licenses, permits and approvals that are now in existence with respect to, and are required for, the development, ownership, operation or improvement of the Property, and are of a continuing nature and pay or perform all obligations arising thereunder prior to Closing.

     (e)    **Disposition of the Property and Other Matters**.    Unless as otherwise provided for herein, for so long as this Agreement remains in force, Seller shall not, without Purchaser's written consent:

{2671913:8}

17

(1)     sell, assign, convey absolutely or as security), grant a security interest in, or otherwise encumber or dispose of, the Property (or any interest or estate therein);

(2)     enter into any contract that will be an obligation affecting the Property subsequent to the Closing; or

(3)     enter into any lease or "back up" sales agreement affecting all or any part of the Property.

5.5.    **Representations and Warranties of Purchaser.** Purchaser hereby makes as of the Effective Date the following representations and warranties to Seller, which representations and warranties shall be updated as of the Closing Date pursuant to Purchaser's Closing Certificate:

(a)     **Binding Obligation.** This Agreement has been duly authorized, executed and delivered by Purchaser, is a valid and binding obligation of Purchaser and is enforceable against Purchaser in accordance with its terms subject to (i) applicable bankruptcy, insolvency, reorganization, moratorium, and other laws affecting the rights of creditors generally; and (ii) the exercise of judicial discretion in accordance with general principles of equity.

(b)     **Organization and Authority.** In the event Purchaser assigns its rights under this Agreement pursuant to Section 9.2 of this Agreement (the "**Assignee**") shall have been duly organized and validly existing under the laws of the State of its formation and authorized to conduct business in the State of Florida as a foreign entity. In such event, the Assignee shall have the right and authority to enter into this Agreement and to purchase the Property pursuant hereto and to consummate or cause to be consummated the transactions contemplated herein.

(c)     **Consents.** Purchaser has obtained all consents and permissions (if any) related to the transactions herein contemplated.

(d)     **Pending Actions.**    There is no action, suit, arbitration, administrative or judicial administrative proceeding, or unsatisfied order or judgment pending or to Purchaser's knowledge, threatened against Purchaser or the transaction contemplated by this Agreement, which, if adversely determined, could individually or in the aggregate have a material adverse effect on Purchaser's ability to consummate the transaction contemplated herein.

(e)     **Financial Status.** Purchaser is solvent, has not made a general assignment for the benefit of its creditors, and has not admitted in writing its inability to pay its debts as they become due, nor has Purchaser filed, nor does it contemplate the filing of, any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, or any other proceeding for the relief of debtors in general, nor has any such proceeding been instituted by or

{2671918;8}

18

against Purchaser, nor is any such proceeding to Purchaser's knowledge threatened or contemplated. The purchase of the Property will not render Purchaser insolvent.

    5.6.  **Survival of Purchaser's Representations and Warranties**. The representations and warranties of Purchaser set forth in Section 5.5 shall not extend beyond the Closing Date.

## ARTICLE 6

  6.  **DEFAULT**

    6.1.  **Default by Purchaser**. If the sale of the Property as contemplated hereunder is not consummated due to Purchaser's default hereunder, then Seller shall be entitled, as its sole and exclusive remedy for such default, to terminate this Agreement and receive the Earnest Money as liquidated damages for the breach of this Agreement and not as a penalty, it being agreed between the parties hereto that the actual damages to Seller in the event of such breach are impractical to ascertain and the amount of the Earnest Money is a reasonable estimate thereof, Seller hereby expressly waiving and relinquishing any and all other remedies at law or in equity. Seller's right to receive the Earnest Money is intended not as a penalty, but as full liquidated damages. The right to receive the Earnest Money as full liquidated damages is Seller's sole and exclusive remedy in the event of default hereunder by Purchaser, and Seller hereby waives and releases any right to (and hereby covenants that it shall not) sue Purchaser: (a) for specific performance of this Agreement, or (b) to recover any damages of any nature or description other than or in excess of the Earnest Money. Purchaser hereby waives and releases any right to (and hereby covenants that it shall not) sue Seller or seek or claim a refund of the Earnest Money (or any part thereof) on the grounds it is unreasonable in amount and exceeds Seller's actual damages or that its retention by Seller constitutes a penalty and not agreed upon and reasonable liquidated damages. This Section 6.1 is subject to Section 6.4 hereof.

    6.2.  **Default by Seller**. If the sale of the Property as contemplated hereunder is not consummated due to Seller's default hereunder, Purchaser shall have the option of terminating this Agreement and instructing the Escrow Agent (subject to Section 1.6 of this Agreement) to refund the Earnest Money to Purchaser or to seek specific performance of this Agreement.

    6.3.  **Notice of Default; Opportunity to Cure**. Neither Seller nor Purchaser shall be deemed to be in default hereunder until and unless such party has been given written notice of its failure to comply with the terms hereof and thereafter does not cure such failure within five (5) business days after receipt of such notice.

    6.4.  **Recoverable Damages**. Notwithstanding Sections 6.1 and 6.2 hereof, in no event shall the provisions of Sections 6.1 and 6.2 limit (i) either Purchaser's or Seller's obligation to indemnify the other party, or the damages recoverable by the indemnified party against the indemnifying party due to a party's express obligation to indemnify the other party in accordance with Sections 3.1(e) and 8.2 of this Agreement, or (ii) either party's obligation to pay

{2671918:8}

19

costs, fees or expenses under Section 4.5 hereof, or the damages recoverable by either party against the other party due to a party's failure to pay such costs.

## ARTICLE 7

### 7.    RISK OF LOSS

7.1.    **Risk of Loss**. Until the purchase of the Property has been consummated on the Closing Date, all risk of loss of, damage to, or destruction of, the Property (whether by fire, flood, tornado or other casualty, or by the exercise of the power of eminent domain, or otherwise) shall belong to and be borne by Seller.

7.2.    **Casualty or Condemnation**. In the event of any damage to or destruction of the Property or any material portion thereof or in the event of any taking or threat of taking by condemnation (or any conveyance in lieu thereof) of any material portion of the Property by anyone having the power of eminent domain, Purchaser shall, by written notice to Seller delivered within ten (10) business days of receiving written notice from Seller of such event, elect to: (a) terminate this Agreement and all of Purchaser's obligations under this Agreement, whereupon the Earnest Money plus interest shall be returned to Purchaser and this Agreement shall terminate and Purchaser and Seller shall have no further rights and obligations hereunder except those which expressly survive termination of this Agreement; or (b) consummate the purchase of the Property. If Purchaser does not elect to terminate this Agreement pursuant to clause (a) of this Section 7.2, then Seller shall on the Closing Date pay to Purchaser all insurance proceeds then (or within ten [10] business days thereafter) received by Seller and all condemnation awards and compensation then or thereafter received by Seller. In addition, Seller shall transfer and assign to Purchaser, in form reasonably satisfactory to Purchaser, all rights and claims of Seller with respect to payment for damages and compensation on account of such damage, destruction or taking.

7.3.    **Notice of Condemnation or Casualty**. Seller shall promptly notify Purchaser immediately upon Seller's receiving notice of the occurrence or existence of any damage, destruction, condemnation or threat of condemnation affecting the Property. Notwithstanding anything in this Agreement to the contrary, Purchaser shall have ten (10) business days after it receives such information from Seller within which to elect between such alternatives, and, accordingly, the Closing Date shall be postponed, if and to the extent necessary, to allow Purchaser such a ten (10) business day period in which to make the election under Section 7.2 above.

## ARTICLE 8

### 8.    COMMISSIONS

8.1.    **Broker and Purchaser's Broker Commission**. The parties acknowledge that Jenkins Realty, Inc. ("**Broker**") has been retained by and represents Seller as broker and that Southfields Real Estate, Inc. has been retained by and represents Purchaser as broker
{2671918;8}

20

("**Purchaser's Broker**") in connection with the sale of the Property by Seller to Purchaser. Seller agrees that Seller shall pay to Broker upon, but only upon, final consummation of the transaction contemplated herein, a real estate brokerage commission pursuant to a separate written agreement between Seller and Broker. Broker agrees to pay Purchaser's Broker upon, but only upon, final consummation of the transaction contemplated herein, a brokerage commission pursuant to a separate written agreement between Broker and Purchaser's Broker. Notwithstanding the foregoing or the separate written agreements referred to herein, Seller shall receive a credit of $302,500.00 against the commission due to Broker (the "**Commission Credit**"), which Commission Credit is equal to the funds currently escrowed by the SFWMD pursuant to the Termination of Easement and Amended and Restated Storm Quality Protection Easement dated July 13, 2009 and recorded September 8, 2009 in Official Records Book 23432, Page 1455, of the Public Records of palm Beach County, Florida. Broker shall deduct the Commission Credit from the brokerage commission otherwise due to Purchaser's Broker. Broker and Purchaser's Broker each acknowledge and agree that no real estate commission or other fee or compensation shall be earned by it or due it if the transaction contemplated herein does not close as a result of Seller's default, Purchaser's default or otherwise. At Closing, upon full payment of its commission, Broker shall (a) pay or instruct the Escrow Agent to pay the Purchaser's Broker the commission due thereto and (b) execute and deliver to Seller and Purchaser a release of any lien or claim of lien of Broker and a general release of any claims arising out of the transactions contemplated by this Agreement, and (c) cause Purchaser's Broker to execute and deliver to Seller and Purchaser a release of lien or any claim of lien of Purchaser's Broker with respect to the Property and this Agreement and a general release of any claims arising out of the transaction contemplated in this Agreement. Purchaser and Seller acknowledge that Broker may reveal the existence of this Agreement, but not the terms or conditions, for purposes of Multiple Listing Services and/or property inquiries.    Purchaser and Seller acknowledge that Broker has discussed the existence of a potential contract with Michael O'Dell and Susan Giddings.

### 8.2.   Representations and Indemnity.

(a)    Purchaser and Seller each hereby represents and warrants to the other that it has not disclosed this Agreement or the subject matter hereof to, and has not otherwise dealt with, any real estate broker, agent or salesman (other than Broker and Purchaser's Broker) so as to create any legal right or claim in any such broker, agent or salesman (other than Broker and Purchaser's Broker) for a real estate commission or similar fee or compensation with respect to the negotiation and/or consummation of this Agreement or the conveyance of the Property by Seller to Purchaser. Except as provided in Section 8.1 with respect to Broker and Purchaser's Broker, Purchaser and Seller shall indemnify, hold harmless and defend each other from and against any and all claims and demands for a real estate brokerage commission or similar fee or compensation arising out of any claimed dealings with the indemnifying party and relating to this Agreement or the purchase and sale of the Property (including reasonable attorneys' fees and expenses and court costs incurred in defending any such claim or in enforcing this indemnity).

{2671918:8}

21

(b)     Broker and Purchaser's Broker each hereby represents and warrants to Seller and Purchaser that, other than to each other, neither has disclosed the contents of this Agreement to, and has not otherwise dealt with, any real estate broker, agent or salesman so as to create any legal right or claim in any such broker, agent or salesman for a real estate commission or similar fee or compensation with respect to the negotiation and/or consummation of this Agreement or the conveyance of the Property by Seller to Purchaser. Further, (x) Broker shall indemnify, hold harmless and defend each of Seller and Purchaser from and against any and all claims and demands for a real estate brokerage commission or similar fee or compensation arising out of any claimed dealings with Broker; and (y) Purchaser's Broker shall indemnify, hold harmless and defend each of the Seller and Purchaser from and against any and all claims and demands for a real estate brokerage commission or similar fee or compensation arising out of any claimed dealings with Purchaser's Broker; relating to this Agreement or the purchase and sale of the Property (including reasonable attorneys' fees and expenses and court costs incurred in defending any such claim or in enforcing this indemnity).

8.3.    **Survival**. This ARTICLE 8 shall survive the rescission, cancellation, termination or consummation of this Agreement.

## ARTICLE 9

9.      **MISCELLANEOUS.**

9.1.    **Public Disclosure**. Prior to Closing, any release to the public of information with respect to the sale contemplated herein or any matters set forth in this Agreement, other than the filing of any pleading which may be required by a court of competent jurisdiction for the purpose of approval of this Agreement, the enforcement of this Agreement, or as set forth in Section 5.4 (e) of this Agreement, shall be mutually agreed upon between Purchaser and Seller and will be made only in the form approved by Purchaser and Seller.

9.2.    **Assignment**. Purchaser may assign all or part of Purchaser's rights under this Agreement to an entity which is directly or indirectly controlled by Purchaser or an affiliate of Purchaser and in which Purchaser or an affiliate of Purchaser holds a direct or indirect controlling ownership interest including, without limitation, J-5 Equestrian LLC, a Colorado limited liability company; however, no such assignment shall release and relieve Purchaser of its obligations hereunder. In addition, not less than ten (10) days prior to Closing, Purchaser may designate or nominate another person or entity, directly or indirectly controlled by Purchaser or an affiliate of Purchaser, to take title to all or any portion of the Property including, without limitation, J-5 Equestrian LLC, a Colorado limited liability company.

9.3.    **Notices**. Any notice, request or other communication (a "**notice**") required or permitted to be given hereunder shall be in writing and shall be delivered by hand or international courier (such as DHL, United Parcel Service or Federal Express) sent on a priority basis for next business day delivery and shall be considered given on the date of such hand or courier delivery. Rejection or other refusal to accept or inability to deliver because of changed address of which no notice was given shall be deemed to be receipt of the notice. By giving at
{2671918:3}

22

least five (5) days' prior written notice thereof, any party may from time to time and at any time change its mailing address hereunder. Any notice of any party may be given by such party's counsel.

The parties' respective addresses for notice purposes are as follows. Telephone numbers are given for convenience of reference only.

| | |
|---|---|
| If to Purchaser: | J-5 Wellington Preserve LLC<br>707 17th Street, Suite 4175<br>Denver, CO 80202<br>Telephone No: (212) 314-1901 |
| with a copy to: | John Metzger, Esq.<br>McDonald Hopkins LLC<br>505 South Flagler Drive, Suite 300<br>West Palm Beach, FL  333401<br>Telephone No.: (561) 472-2121 |
| if to Seller: | Baker Tilly Gomez<br>c/o Wellington Preserve Corporation<br>28 Cumberland Street<br>P.O. Box N-1991<br>Nassau, Bahamas<br>Attention: Craig A. (Tony) Gomez<br>Telephone: (242) 356-4114 |
| with a copy to: | Fowler White Burnett P.A.<br>Espirito Santo Plaza<br>14th Floor<br>1395 Brickell Avenue<br>Miami, FL 33131-3302<br>Attention: Norman I. Weil<br>Telephone: (305) 789-9245 |
| if to Broker: | Jenkins Realty, Inc.<br>5730 Corporate Way, Suite 120<br>West Palm Beach, FL  33407<br>Attention: Ms. Diane Jenkins<br>Telephone: (561) 640-4059 |

{2671913:8}

23

if to Purchaser's Broker:  Southfields Real Estate, Inc.
13304 Indian Mound Road
Wellington, FL 33414
Attention:  Mr. Carlos Arellano
Telephone:  (561) 795-9777

9.4.    **Modifications.**  This Agreement cannot be changed orally, and no agreement shall be effective to waive, change, modify or discharge it in whole or in part unless such agreement is in writing and is signed by the parties against whom enforcement of any waiver, change, modification or discharge is sought.

9.5.    **Calculation of Time Periods.**  Unless otherwise specified, in computing any period of time described in this Agreement, the day of the act or event after which the designated period of time begins to run is not to be included and the last day of the period so computed is to be included, unless such last day is a Saturday, Sunday or legal holiday under the laws of the State in which the Property is located, in which event the period shall run until the end of the next day which is neither a Saturday, Sunday or legal holiday. The final day of any such period shall be deemed to end at 5:00 p.m., Eastern time.

9.6.    **Successors and Assigns.**  Subject to Section 9.2 hereof, the terms and provisions of this Agreement are to apply to and bind the permitted successors and assigns of the parties hereto.

9.7.    **Entire Agreement.**   This Agreement, including the Schedules and Exhibits, contain the entire agreement between the parties pertaining to the subject matter hereof and fully supersede all prior written or oral agreements and understandings between the parties pertaining to such subject matter.

9.8.    **Further Assurances.**  Each party agrees that it will without further consideration execute and deliver such other documents and take such other action, whether prior or subsequent to Closing, as may be reasonably requested by the other party to consummate more effectively the purposes or subject matter of this Agreement. Without limiting the generality of the foregoing, Purchaser shall, if requested by Seller, execute acknowledgments of receipt with respect to any materials delivered by Seller to Purchaser with respect to the Property. The provisions of this Section 9.8 shall survive Closing.

9.9.    **Counterparts; Electronic Delivery.**  This Agreement may be executed in counterparts, and all such executed counterparts shall constitute the same agreement. It shall be necessary to account for only one such counterpart in proving this Agreement.  The parties agree that any signature delivered by facsimile or electronic transmission shall be treated in all manner respect as an original document.

{2671918;8}

24

9.10.  **Severability**. If any provision of this Agreement is determined by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Agreement shall nonetheless remain in full force and effect.

9.11.  **Applicable Law**. This Agreement is performable in the state in which the Property is located and shall in all respects be governed by, and construed in accordance with, the substantive federal laws of the United States and the laws of such state. Seller and Purchaser hereby irrevocably submit to the jurisdiction of any state or federal court sitting in the state and judicial district in which the Property is located in any action or proceeding arising out of or relating to this Agreement and hereby irrevocably agree that all claims in respect of such action or proceeding shall be heard and determined in a state or federal court sitting in the state and judicial district in which the Property is located. Purchaser and Seller agree that the provisions of this Section 9.11 shall survive the Closing of the transaction contemplated by this Agreement.

9.12.  **No Third Party Beneficiary**. The provisions of this Agreement and of the documents to be executed and delivered at Closing are and will be for the benefit of Seller and Purchaser only and are not for the benefit of any third party, and accordingly, no third party shall have the right to enforce the provisions of this Agreement or of the documents to be executed and delivered at Closing.

9.13.  **Exhibits and Schedules**. The following schedules or exhibits attached hereto shall be deemed to be an integral part of this Agreement:

| | |
|---|---|
| Schedule 1.1(a) | Legal Description of the Land |
| Schedule 2.1 | Title Commitment |
| Schedule 2.3(a)(i) | Bridle Trail Easement |
| Schedule 3.1(b) | Property Documents |
| Schedule 5.4(c) | Revised Bridle Trail Easement |
| Exhibit 4.2(a) | Form of Special Warranty Deed |

9.14.  **Captions**. The section headings appearing in this Agreement are for convenience of reference only and are not intended, to any extent and for any purpose, to limit or define the text of any section or any subsection hereof.

9.15.  **Construction**. The parties acknowledge that the parties and their counsel have reviewed and revised this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or any exhibits or amendments hereto.

9.16.  **Termination of Agreement**. It is understood and agreed that if either Purchaser or Seller terminates this Agreement pursuant to a right of termination granted hereunder, such termination shall operate to relieve Seller and Purchaser (in which event the defaulting Party shall remain liable as provided in this Agreement) from all obligations under this Agreement, except for such obligations as are specifically stated herein to survive the termination of this Agreement.

{2671918:8}

25

Apr 18 11 06:19p          Southfields Real Estate                    561-795-9666              p.12

9.17.   **Survival**. All provisions of this Agreement which are not fully performed as of Closing shall survive Closing subject to the terms and provisions set forth in Sections 5.3 and 5.6 respectively.

9.18.   **Time of Essence**. Time is of the essence with respect to this Agreement.

{267191 8:8}

26

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the Effective Date.

**PURCHASER:**

J-5 Wellington Preserve LLC,
    a Colorado limited liability company

By: J-5 Holdings LLC, its Manager

    By: _____
        Robert P. Jornayvaz III, Manager

**SELLER:**

WELLINGTON PRESERVE CORPORATION, a Florida corporation, as Debtor in Possession in Case No. 10-22049-EPK, United States Bankruptcy Court, Southern District of Florida, West Palm Beach Division

By: _____
    Craig A. (Tony) Gomez, President

**BROKER:**

JENKINS REALTY, INC., a Florida corporation
By _____
Print Name: Diane Jenkins
Title: President

{2671918:8}

27

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the Effective Date.

**PURCHASER:**

J-5 Wellington Preserve LLC,
     a Colorado limited liability company

By: J-5 Holdings LLC, its Manager

By: _____
     Robert P. Jornayvaz III, Manager

**SELLER:**

WELLINGTON PRESERVE CORPORATION, a Florida corporation, as Debtor in Possession in Case No. 10-22049-EPK, United States Bankruptcy Court, Southern District of Florida, West Palm Beach Division

By: _____
     Craig A. (Tony) Gomez, President

**BROKER:**

JENKINS REALTY, INC., a Florida corporation

By _____
Print Name: Diane Jenkins
Title: President

{2671918:8}

27

**PURCHASER'S BROKER:**

SOUTHFIELDS REAL ESTATE, INC.

By: _____

Print Name: *CARLOS R. ARELLANO*

Title: *PRESIDENT*

{2671918:8}

## Schedule 1.1(a)

### Legal Description of Land

Lots 1 through 29 inclusive, Block A, Tract A and Tract B, Block A, Lots 1 through 12, inclusive, and Lot 25, Block B, Lots 2 through 10, inclusive, and Lots 15 through 23, inclusive, Block C, Lots 1 through 11 inclusive, and Lots 14 through 23, inclusive, Block D, Plat of Wellington Preserve recorded in Plat Book 100, Pages 100-186 inclusive, of the Public Records of Palm Beach County, Florida.

{2671918:8}

**Schedule 2.1**

**Title Commitment**

# *First American Title Insurance Company*

Agent's File No.                                                                 Issuing Office File No. 1062- 2531999/GML

## SCHEDULE A

Date Issued:       April 19, 2011
Date Effective:    April 7, 2011, at 11:59 P.M.

2.    Policy or Policies to be issued:                              Amount of Policy: $40,000,000.00

      (a) A. L. T. A. Owner's Policy Form (10-17-1992)(with Florida Modifications)

             Proposed Insured:       J-5 Wellington Preserve LLC, a Colorado limited liability
                                     company

      (b) A. L. T. A. Loan Policy                              Amount of Policy: $N/A
          (10-17-1992)(with Florida Modifications)

             Proposed Insured:       N/A.

3.    The estate or interest in the land described or referred to in this Commitment and covered herein is an estate or interest designated as follows:

      Fee Simple

4.    Title to the estate or interest in the land described or referred to in this Commitment and covered herein (and designated as indicated in No. 3 above) is, at the effective date hereof, vested in:

      Wellington Preserve Corporation, a Florida corporation, Chapter 11 Debtor in Possession,

5.    The land referred to in this Commitment is in the State of Florida, County of Palm Beach, and described as follows:

      SEE EXHIBIT A ATTACHED HERETO AND INCORPORATED HEREIN BY THIS REFERENCE.

THIS COMMITMENT IS FURNISHED BY FIRST AMERICAN TITLE INSURANCE COMPANY OR ITS POLICY ISSUING AGENT SOLELY FOR THE ISSUANCE OF A POLICY OR POLICIES OF TITLE INSURANCE OF FIRST AMERICAN TITLE INSURANCE COMPANY. THIS COMMITMENT IS NOT AN ABSTRACT OR AN OPINION OF TITLE. LIABILITY UNDER THIS COMMITMENT IS DEFINED BY AND LIMITED TO THE TERMS AND CONDITIONS OF THIS COMMITMENT AND THE TITLE INSURANCE POLICY TO BE ISSUED. PERSONS AND ENTITIES NOT LISTED ABOVE AS PROPOSED INSUREDS ARE NOT ENTITLED TO RELY UPON THIS COMMITMENT FOR ANY PURPOSE.

                                      Fowler White Burnett P.A.

                                      By

                                            Authorized Signatory

# *First American Title Insurance Company*

Agent's File No.                                        Issuing Office File No. 1062- 2531999/GML

## Exhibit A

All of the plat of WELLINGTON PRESERVE as recorded in Plat Book 100 Pages 180 through 186, inclusive, of the Public Records of Palm Beach County, Florida, less and except the following lots therein:

Lots 37 through 48, inclusive, Block A;

Lots 16 through 24, inclusive,, Block B;

Lots 1, 11 through 14, inclusive, 24, through 26, inclusive, Block C;

Lot 12, 13, 24 and 25, Block D; and

further less and except all of the Plat of IROQUOIS FARM as recorded in Plat Book 107 Pages 199 and 200 of the Public Records of Palm Beach County, Florida.

# *First American Title Insurance Company*

Agent's File No.                                  Issuing Office File No. 1062- 2531999/GML

## SCHEDULE B-1
### (Requirements)

The following are the requirements to be complied with:

1.   Payment to, or for the account of, the grantors or mortgagors of the full consideration for the estate or interest to be insured.

2.   Payment of all taxes, assessments, levied and assessed against subject premises, which are due and payable.

3.   Satisfactory evidence shall be produced that all improvements and/or repairs or alterations thereto are completed; that contractor, subcontractor, labor and materialmen are all paid in full.

4.   Instruments in insurable form which must be properly executed, delivered and duly filed for record:

   a.   Warranty Deed from Wellington Preserve Corporation, a Florida corporation, executed by Craig A. (Tony) Gomez, as president, to J-5 Wellington Preserve LLC, a Colorado limited liability company, pursuant to, and after an order confirming, the Joint Plan of Liquidation of Debtor and Clico Enterprises Ltd. currently filed in Bankruptcy Case #: 10-22049-EPK, styled *In re: Wellington Preserve Corporation,* currently pending in the U. S. Bankruptcy Court, Southern District of Florida (West Palm Beach Division).

5.   Satisfaction of that Final Judgment Against Wellington Preserve Corporation entered in Case No, 05-010118 (18), styled *Brennan Financial, Inc., v. Dalco Properties, Inc., et. al.* recorded January 28, 2010 in Official Records Book 23665, page 1666.

6.   Satisfaction of the following Claims of Lien:

   a.   Claim of Lien filed by Lucido & Associates, LLP recorded March 9, 2010 in Official Records Book 23732, page 302;

   b.   Claim of Lien filed by H & J Contracting, Inc., recorded April 7, 2010 in Official Records Book 23781, page 1659;

   c.   Claim of Lien filed by O'Dell, Inc., recorded May 6, 2010 in Official Records Book 23831, page 2000;

   d.   Claim of Lien filed by Dunkelberger Engineering & Testing Inc., recorded May 19, 2010 in Official Records Book 23855, page 768; and

   e.   Claim of Lien filed by Alan Gerwig & Associates, Inc., recorded June 9, 2010 in Official Records Book 23891, page 1281.

7.   We will require proof of payment of 2008, 2009 and 2010 real estate taxes and redemption of any tax certificates issued with respect thereto.

8.   The Company is to be advised as to the identity and nature of the proposed insured under the owner's policy/mortgagor under the loan policy, and reserves the right to make such additional requirements as it may deem necessary.

# *First American Title Insurance Company*

Agent's File No.                                         Issuing Office File No. 1062- 2531999/GML

9. We will require written evidence, from appropriate governmental authorities, that city, county and other special assessment district liens and utility charges, including waste, water and sewer, gas and trash removal charges, if any, have been paid.

10. Upon receipt of a survey acceptable to the Company, certified in accordance with Section 472.027, Florida Statutes, and which otherwise meets the requirements of Section 627.7842, Florida Statutes, the survey exception and unrecorded easement exception shall be deleted. The Policies issued hereunder will be subject to a Special Exception for adverse matters disclosed by said survey.

11. Upon receipt of an Affidavit of possession and no-liens, pursuant to Section 627.7842, Florida Statutes, the parties in possession exception unrecorded easement exception the mechanics lien exception shall be deleted. The Policies issued hereunder will be subject to a Special Exception for the rights of parties disclosed by said Affidavit.

12. The Company will insure the period of time between the last title examination and the recording of the instrument giving rise to the interest being insured provided:

    a. The Company updates title at or near the time of closing and such update is satisfactory to the Company;

    b. The Seller and/or Borrower provide an Affidavit that there are no matters that could give rise to a lien that would attach to the property between the effective date hereof and recording of the interest to be insured; and

    c. The instrument giving rise to the interest being to be insured is recorded as soon as possible after closing.

# *First American Title Insurance Company*

Agent's File No.                                    Issuing Office File No. 1062- 2531999/GML

## SCHEDULE B-II
### (Exceptions)

Schedule B of the policy or policies to be issued will contain exceptions to the following matters unless the same are disposed of to the satisfaction of the Company.

1.  Defects, liens, encumbrances, adverse claims, or other matters, if any, created, first appearing in the public records or attaching subsequent to the effective date hereof but prior to the date the proposed Insured acquires for value of record the estate or interest or mortgage thereon covered by this Commitment.

2.  Rights or claims of parties in possession not shown by the public records.

3.  Easements, or claims of easements, not shown by the public records.

4.  Encroachments, overlaps, boundary line disputes. or other matters which would be disclosed by an accurate survey or inspection of the premises.. Any map or diagram now or previously provided is for reference and informational purposes only.  The Company and its agents expressly disclaim any liability for alleged loss or damage which may result from reliance upon such map(s).  The foregoing does not limit any express coverages provided by the terms and provisions of any title insurance policy for matters which might be revealed by a survey prepared and certified in accord with Fla. Stat. §472.027 or as to any recorded plat maps incorporated by reference into the description of the insured property.

5.  Any lien, or right to a lien, for services, labor, or material heretofore or hereafter furnished, imposed by law and not shown by the public records.

6.  . Intentionally deleted.

7.  Taxes or special assessments which are not shown as existing liens by the public records.

8.  Palm Beach County property taxes for the year 2011 and subsequent years, which are not yet due and payable.

9.  Restrictions, reservations and easement as indicated and/or shown on that certain plat of WELLINGTON PRESERVE recorded in Plat Book 100, page 180 through 186.

10. Oil, gas and mineral reservations as recorded in Deed Book 731, page 494, as affected by Release of Surface Exploration Rights recorded in Official Records Book 2287, page 75 and by Affidavit recorded in Official Records Book 5713, page 744, together with Notice of Interest recorded in Sub Surface Rights Book 1, page 39.  The Humble Oil Company lease refernnced therein was released by instrument recorded in Deed Book 887, page 3.

11. Oil. gas and mineral reservations contained in deed from Model Land Company, recorded March 30, 1951 in Deed Book 938, page 442, as affected by Non-Use Commitment recorded in Official Records Book 2287, page 83 and further affected by Release of Surface Exploration Rights as recorded in Official Records Book 2955. page 1028, as corrected In Official Records Book 3079, Page 1522, together with Notice Under F.S. §704.05 recorded in Official Records Book 2622, page 241.

12. Terms and conditions of Declaration of Covenants, Conditions and Restrictions of Wellington Preserve recorded March 14, 2005 in Official Records Book 18255, page 807, as amended by First Amendment to Declaration of Covenants, Conditions and Restrictions of Wellington Preserve recorded June 9, 2005 in Official Records Book 18719, page 453; Second Amendment to Declaration of Covenants, Conditions and Restrictions of Wellington Preserve recorded June 9, 2005 in Official Records Book 18719, page 518; Third Amendment to Declaration of Covenants, Conditions and.-

# *First American Title Insurance Company*

Agent's File No. _____                                    Issuing Office File No. 1062- 2531999/GML

Restrictions of Wellington Preserve and Imposition of Alternative Covenants Conditions and Restrictions recorded May 24, 2010 in Official Records Book 23862, page 567 ("Third Amendment"); and that Fourth Amendment to Declaration of Covenants, Conditions and Restrictions of Wellington Preserve and Imposition of Alternative Covenants Conditions and Restrictions recorded _____ in Official Records Book _____, page _____ ("Fourth Amendment") (Note: the Fourth Amendment shall be substantially similar to the Third Amendment except the "Released Property" shall be Lots 37 through 48, inclusive, Block A and ,Lots 16 through 24, inclusive, Block B WELLINGTON PRESERVE according to the plat thereof, as recorded in Plat Book 100 Pages 180 through 186, inclusive, of the Public Records of Palm Beach County, Florida)

13.   Stormwater Quality Protection Easement recorded June 8, 2005 in Official Records Book 18714, page 409, as amended by Termination of Easement and Amended and Restated Storm Water Quality Protection Easement recorded September 8, 2009 in Official Records Book 23432, page 1455

14.   Easement to Florida Power & Light Company, recorded October 31, 2006 in Official Records Book 21028, page 1893.

15.   Memorandum Of Utility Services Agreement recorded January 9, 2007 in Official Records Book 21288, page 1429.

16.   Easement Deed – Water recorded March 13, 2007 in Official Records Book 21509, page 1273

17.   Easement to Bellsouth Telecommunications, Inc., recorded November 20, 2007 in Official Records Book 22266, page 1769.

18.   Reciprocal Easement and Maintenance Agreement by and among Wellington Preserve Corporation, Wellington Training Club Property Owners' Association f/k/a Wellington Preserve Master Homeowners' Association, Inc., and Charisma Partners, L. P., recorded May 24, 2010 in Official Records Book 23862, page 573

19.   Reciprocal Easement and Maintenance Agreement by and among Wellington Preserve Corporation, Wellington Training Club Property Owners' Association f/k/a Wellington Preserve Master Homeowners' Association, Inc., (the "Association") and ZACARA FARM, LLC, recorded _____ in Official Records Book _____, page _____ (substantially similar to the "Reciprocal Easement and Maintenance Agreement" recorded in Official Records Book 23682, Page 573).

20.   Reciprocal Easement Agreement by and among Wellington Preserve Corporation, the Association and ZACARA FARM, LLC, to provide access to the Released Property from 50th  Street and provide the Association access to the adjoining property controlled by the Association recorded _____ in Official Records Book _____, page _ _____.

21.   Terms and conditions of that certain Environmental Resource Permit Notice, recorded in Official Records Book 16410, page 214.

22.   Environmental Resource Permit Notice recorded July 19, 2004 in Official Records Book 17271, page 1677.

Schedule B-II - Page 2 of 3 Pages

# *First American Title Insurance Company*

Agent's File No.                                          Issuing Office File No. 1062- 2531999/GML

23.    Environmental Resource Permit Notice recorded April 12, 2007 in Official Records Book 21615, page 428

24.    Notice of Environmental Resource or Surface Water Management Permit recorded August 11, 2009 in Official Records Book 23383, page 960

25.    Grant of Easement for Equestrian Trails dated July 6, 2005

Note:  The owner's policy issued pursuant hereto shall contain Florida Form 9.1, ALTA 5.1 PUD, Florida Survey and Florida Contiguity Endorsements.

ALL IN THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA.

## Schedule 2.3(a)(1)
## Bridle Trail Easement

{2671918;8}                                              2

## GRANT OF EASEMENT FOR EQUESTRIAN TRAILS

THIS EASEMENT, executed this 10th day of July, 2005 by WELLINGTON PRESERVE CORPORATION with offices at P.O. Box N-3942, 114 Mount Royal Avenue, Nassau, Bahamas (hereinafter referred to as the "GRANTOR"), the VILLAGE OF WELLINGTON, a municipal corporation, and the ACME IMPROVEMENT DISTRICT, a dependent special district thereof, having their principal place of business at 14000 Greenbriar Blvd., Wellington, Florida 33414 (hereinafter referred to as "GRANTEE").

### WITNESSETH:

GRANTOR, for and in consideration of the sum of Ten Dollars ($10.00) and other good and valuable considerations, as well as for the undertakings by the GRANTEE as hereinafter provided, the receipt and sufficiency of which is hereby acknowledged, has and by these presents does hereby grant and convey to GRANTEE an exclusive easement for the purposes of operating and maintaining an equestrian bridle trail on, in, over, and under the following described real property attached hereto and incorporated herein as Exhibit "A."

Said exclusive easement shall be used by GRANTEE for access to, and further for use by GRANTEE for the construction, operation, and maintenance of an equestrian bridle trail

The GRANTOR, its successors and assigns, shall not plant any plants (other than grass) or build any structure in the easement area unless approved by GRANTEE. The GRANTOR, its successors, and assigns shall be responsible for maintaining all grass and all other permitted plans and structures within the easement without recourse to the GRANTEE.

GRANTOR does hereby fully warrant the title to said land and will defend the same against the lawful claims of all persons whomsoever claimed by, through, or under it, that it has good right and lawful authority to grant the above-described easement, and that the same is unencumbered. Where the context of this Grant of Easement allows or permits, the same shall include the successors or assigns of the parties.

GRANTOR agrees to provide for the execution of a joinder and consent by any and all mortgagees or lienors of mortgages or liens encumbering this easement.

This easement shall be binding upon and shall inure to the benefit of the respective parties, their successors or assigns and grantees.

This easement shall be governed by the laws of the State of Florida as now and hereafter in force.

The venue of any litigation arising out of this Agreement shall be exclusively in Palm Beach County, Florida.

**IN WITNESS WHEREOF,** the undersigned has signed and sealed this document on the day and year first above written.

Signed, sealed and delivered in the presence of:

Witnesses:

*Byrd*

BERNADETTE HYNDMAN
Print Name:

KHALIDI JACKSON-FREDERICK
Print Name:

WELLINGTON PRESERVE
CORPORATION, a Florida corporation

By: *Karen Gardier*
    Karen-Ann Gardier,
    Chief Operating Officer

STATE OF _TRINIDAD_

COUNTY OF _Port of Spain_

    The foregoing instrument was acknowledged before me this ~~6th~~ day of July, 2005 by Karen-Ann Gardier as Chief Operating Officer of Wellington Preserve Corporation, a Florida corporation. She is ☑ personally known to me or ☐ has produced _____ as identification, and who did take an oath.

*Andrew Clifford Johnson*
Notary Public, State of _TRINIDAD_

Print Name: _ANDREW CLIFFORD JOHNSON_

ANDREW CLIFFORD JOHNSON
NOTARY PUBLIC
5-7 SWEET BRIAR ROAD
ST CLAIR
PORT OF SPAIN
TRINIDAD W.I






**EXHIBIT "A"**

## SKETCH AND LEGAL DESCRIPTION
### (NOT A SURVEY)
**WELLINGTON PRESERVE**
**EQUESTRIAN TRAIL EASEMENT**

LEGAL DESCRIPTION

THE NORTH 16.00 FEET OF "WELLINGTON PRESERVE", ACCORDING
TO THE PLAT THEREOF, AS RECORDED IN PLAT BOOK 100 AT PAGES 190 THROUGH
195 OF THE PUBLIC RECORDS OF PALM BEACH COUNTY, FLORIDA.

TOGETHER WITH:
THE EAST 16.00 FEET OF SAID "WELLINGTON PRESERVE",
THE SOUTH 16.00 FEET OF SAID WELLINGTON PRESERVE,
AND THE WEST 16.00 FEET OF SAID "WELLINGTON PRESERVE".

SAID LANDS SITUATE IN THE CITY OF WELLINGTON, PALM BEACH COUNTY, FLORIDA.

ABBREVIATIONS

NOTES
1. REPRODUCTIONS OF THIS SKETCH ARE NOT VALID
WITHOUT THE SIGNATURE AND THE ORIGINAL RAISED
SEAL OF A FLORIDA LICENSED SURVEYOR AND MAPPER.
2. NO SEARCH OF THE PUBLIC RECORDS WAS MADE
IN THE PREPARATION OF THIS SKETCH AND DESCRIPTION.

CERTIFICATION
I HEREBY CERTIFY THAT THE SKETCH AND DESCRIPTION SHOWN HEREON
COMPLIES WITH MINIMUM TECHNICAL STANDARDS AS CONTAINED IN
CHAPTER 61G17-6, FLORIDA ADMINISTRATIVE CODE, PURSUANT TO
SECTION 472.027, FLORIDA STATUTES, AND THAT SAID SKETCH AND
DESCRIPTION IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE
AND BELIEF AS PREPARED UNDER MY DIRECTION.

SURVEYOR AND MAPPER
FLORIDA LICENSE NO. LS5111

LAST DATE OF FIELD WORK :  NOT A SURVEY



WPB-FS1\547774v01\68962.010500

## CONSENT AND JOINDER OF HOMEOWNERS ASSOCIATION

The undersigned, **Wellington Preserve Master Homeowners Association, Inc.,** a Florida not for profit corporation, hereby consents and joins in the foregoing Grant of Easement from Wellington Preserve Corporation, a Florida corporation ("Grantor") to the Village of Wellington, a municipal corporation and the Acme Improvement District, a dependent special district thereof ("Grantee) and agrees that such easement shall be binding upon the undersigned and its successors in title.

IN WITNESS WHEREOF, this Consent and Joinder is executed by the undersigned this _____ day of July, 2005.

Witnesses:

**Wellington Preserve Master Homeowners Association, Inc., a Florida not-for-profit corporation**

Name: _BERNADETTE HYNDMAN_

By: _Karen Gardier_
Karen-Ann Gardier, President

_KIMLIN JACKSON FREDERICK_
Name: _____

STATE OF _TRINIDAD_        )
                                             )  ss.:
COUNTY OF_____        )

The foregoing instrument was acknowledged before me this _6th_ day of July, 2005 by Karen-Ann Gardier, as President, of Wellington Preserve Master Homeowners Association, Inc., a Florida not for profit corporation, on behalf of the Association. She is personally known to me ~~or has produced~~ _____ ~~as identification.~~

Notary: _Audrey Clifford_
Print Name: _ANDREW CLIFFORD JOHNSON_
Notary Public, State of _TRINIDAD_
My commission ~~expires~~ _for life_

**NOTARY SEAL**
**ANDREW CLIFFORD JOHNSON**
NOTARY PUBLIC
5-7 SWEET BRIAR ROAD
ST CLAIR
PORT OF SPAIN
TRINIDAD W.I

TRINIDAD & TOBAGO
50¢

WPB-FS1\547876v01\68962.010500

 

## CONSENT AND JOINDER

The undersigned, being owner of the following described property, in Palm Beach County, Florida, to wit:

Lots 30 – 36, Block A, Wellington Preserve, according to the Plat thereof as recorded in Plat Book 100, Pages 180 through 186 of the Public Records of Palm Beach County, Florida.

does hereby consent and join in the foregoing Grant of Easement from Wellington Preserve Corporation, a Florida corporation ("Grantor") to the Village of Wellington, a municipal corporation and the Acme Improvement District, a dependent special district thereof (collectively, "Grantee") and agrees that such easement shall be binding upon the undersigned and its successors in title.

IN WITNESS WHEREOF, this Consent and Joinder is executed by the undersigned this _20_ day of July, 2005.

**WITNESSES:**

**OWNER:**

**CHARISMA PARTNERS, L.P.,** a New York limited partnership

By: ~~EIGHTH~~ 8TH FLOOR REALTY
       CORPORATION, a New York corporation,
       its General Partner

Print Name: _RONNIE STANISLAVSKY_

Print Name: _RITA AUGHAVIN_

By: _____
Name: _KEVIN S. MOORE_
Title: _PRESIDENT_

STATE OF *New York*                )
                                   )  ss.:
COUNTY OF *New York*               )

   The foregoing instrument was acknowledged before me this 20th day of *July* 2005 by *Kevin S Moore*, as *President* of Eighth Floor Realty Corporation, a New York corporation, the General Partner of Charisma Partners, L.P.,  a New York limited partnerhip.  She/He is personally known to me ~~or has produced~~ _____ ~~as identification.~~

My commission expires:  4/8/07

NOTARY PUBLIC:

_____
(Signature of Notary Public)

*VIVIEN TROY*
_____
(Printed Name of Notary Public)

STATE OF *NEW YORK*
_____

VIVIEN TROY
NOTARY PUBLIC, State of New York
No. 31-4979043
Qualified in New York County
Commission Expires April 8, 20 *07*

WPB-FS1\547853v01\68962.010500

## Schedule 3.1(b)

### Property Documents

1. Any and all documentation in connection with the environmental condition of the Property;

2. Any and all geotechnical, foundation and soils reports;

3. All recorded documents affecting the Property;

4. Current and updated title reports on the Property together with copies of all supporting documents and exhibits; and

5. All permits, agreements and filings with governmental or quasi-governmental agencies.

6. Those documents previously delivered by O'Dell, Inc. to John Metzger, Esq. as more particularly described in that certain "WTC/Wellington Preserve-Due Diligence Transmittal to John Metzger/Howard Coates 3/15/11".

{2671918;3}                                    1

### Exhibit 3.1(d)

### Adjacent Property

Lots 37-48 inclusive, Block A and Lots 16-24 inclusive, Block B, Plat of Wellington Preserve recorded in Plat Book 100, Pages 100-186 inclusive, of the Public Records of Palm Beach County, Florida.

{2671918:8}

1

**Exhibit 4.2(a)**
**Form of Special Warranty Deed**

Prepared By and after
recording, return to:
Norman I. Weil, Esq.
Fowler White Burnett P.A.
1395 Brickell Avenue, 14th Floor
Miami, Florida 33176

Tax Folio No.'s:  See Attached
            **Exhibit "C"**

## SPECIAL WARRANTY DEED

THIS INDENTURE, made this ____ day of _____ 2011, by and between **WELLINGTON PRESERVE CORPORATION**, a Florida corporation, as Debtor in Possession in Case No. 10-22049-EPK, United States Bankruptcy Court, Southern District of Florida, West Palm Beach Division, having its principal office at c/o Baker Tilly Gomez, 28 Cumberland Street, P.O. Box N-1991, Nassau, Bahamas, Attention: Craig A. (Tony) Gomez (hereinafter referred to as "Grantor") and _____, a _____ having its principal office at _____ (hereinafter referred to as "Grantee") (the words "Grantor" and "Grantee" to include their respective successors and assigns where the context requires or permits);

WITNESSETH, That:

Grantor, for and in consideration of the sum of TEN AND NO/100 DOLLARS ($10.00) in hand paid at and before the sealing and delivery of these presents, and other good and valuable consideration paid to Grantor, the receipt and sufficiency whereof are hereby acknowledged, has granted, bargained, aliened, conveyed and confirmed, and by these presents does hereby grant, bargain, alien, convey and confirm unto the said Grantee that certain tract or parcel of land described on **Exhibit A**, attached hereto and incorporated herein by this reference (hereinafter referred to as the "**Property**"), without warranty as to those certain matters set forth and described on **Exhibit B** attached hereto and incorporated herein by this reference (hereinafter referred to as the "**Permitted Exceptions**").

TO HAVE AND TO HOLD the Property, subject to the Permitted Exceptions, with all and singular the rights, members and appurtenances thereof, to the same being, belonging, or in anywise appertaining, to the only proper use, benefit and behoof of Grantee forever in FEE SIMPLE.

{2671918:8}

AND GRANTOR will warrant and forever defend the right and title to the Property unto Grantee, its successors and assigns, against the claims of all persons claiming through or under Grantor (other than a claim arising out of the Permitted Exceptions), but not otherwise.

IN WITNESS WHEREOF, Grantor has executed this Special Warranty Deed under seal as of the day and year first above written.

WELLINGTON PRESERVE CORPORATION, a Florida corporation, as Debtor in Possession in Case No. 10-22049-EPK, United States Bankruptcy Court, Southern District of Florida, West Palm Beach Division

By: _____
Craig A. (Tony) Gomez, President

STATE OF FLORIDA            )
                            ) :ss
COUNTY OF MIAMI-DADE        )

The foregoing instrument was acknowledged before me this _____ day of _____, 2011 by Craig A. (Tony) Gomez, as President, of Wellington Preserve Corporation, a Florida corporation, as Debtor in Possession in Case No. 10-22049-EPK, United States Bankruptcy Court, Southern District of Florida, West Palm Beach Division, on behalf of the corporation, ▢ who is personally known to me or ▢ who has produced _____ as identification.

_____
Notary Public, STATE OF FLORIDA
*Print Name:*_____
My Commission Expires:

{2671918:8}2

## Exhibits to Special Warranty Deed

Exhibit A – Legal Description of the Property

Exhibit B – Permitted Exception

Exhibit C – Folio Numbers

## Schedule 5.1(j)

1.    Permit Non-Compliance

2.    Obligation to pave 50th Street pursuant to that certain Village of Wellington Resolution
      No. R2008-116

3.    Obligation to landscape and construct berms as required by the Development Order for the
      Subdivision

4.    Any unfunded obligations of the "Declarant" under the Declaration


W:\1-2548-niw.doc